UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CASE NO.: 1:17-cv-02673-JPH-TAB


Estate of ANDRE ALEXANDER      )
GREEN, deceased                )
                               )
                Plaintiff,     )
                               )
        -vs-                   )
                               )
CITY OF INDIANAPOLIS, et al.   )
                               )
                Defendants,    )


DEPOSITION OF WILLIAM HARMENING



    The deposition upon oral examination of
WILLIAM HARMENING, a witness produced and sworn before
Candace Harvey, Notary Public in and for the County of
Marion, State of Indiana, taken on behalf of the
Defendant at the offices of Associated Reporting, Inc.,
251 East Ohio Street, Suite 940, Indianapolis, Marion
County, Indiana, commencing at 1:00 p.m. on the 21st
Day of January 2019, pursuant to the Federal Rules of
Civil Procedure.



ASSOCIATED REPORTING, INC.
251 EAST OHIO STREET, SUITE 940
INDIANAPOLIS, INDIANA 46204
(317) 631-0940
www.associated-reporting.com

APPEARANCES


FOR THE PLAINTIFF:

TRENT A. MCCAIN
McCAIN LAW OFFICES, P.C.
5655 BROADWAY, SUITE 2S
MERRILLVILLE, INDIANA 46410


FOR THE DEFENDANT:

ANDREW J. UPCHURCH
OFFICE OF CORPORATION COUNSEL
200 EAST WASHINGTON STREET, ROOM 1601
INDIANAPOLIS, INDIANA 46204


FOR THE DEFENDANT:

JOHN F. KAUTZMAN
RUCKELSHAUS, KAUTZMAN, BLACKWELL, & BEMIS, LLP
135 NORTH PENNSYLVANIA STREET, SUITE 1600
INDIANAPOLIS, INDIANA 46204


EXAMINATION

                                              PAGE

EXAMINATION BY MR. UPCHURCH                      3

EXAMINATION BY MR. KAUTZMAN                    157


INDEX OF EXHIBITS

NO.      DESCRIPTION                        PAGE

1        RESUME OF WILLIAM HARMENING           5

2        FORCE ANALYSIS OF ANDRE GREEN        85

3        UPDATED TESTIMONY LIST               88

4        AUTOPSY PHOTO                       127

```
 1                    WILLIAM HARMENING, the witness herein,
 2      having been first duly sworn to tell the truth,
 3      the whole truth, and nothing but the truth,
 4      testified as follows:
 5      EXAMINATION,
 6          QUESTIONS BY MR. UPCHURCH:
 7   Q.   Please state your name.
 8   A.   William Harmening.
 9   Q.   Hello, Mr. Harmening.  My name is Andrew Upchurch.
10        I represent the defendants in this matter.  You are
11        here today for your deposition.  Have you ever had
12        a deposition before?
13   A.   Yes.
14   Q.   Approximately, how many times have you given
15        deposition testimony?
16   A.   I do have an updated list that I brought.
17   Q.   Oh, perfect.
18   A.   It's in my report that I have had more testimony
19        since then.  So that would be all my depositions.
20        That's an actual list.
21   Q.   Okay.  Sounds good.
22            So just briefly to go over what to expect
23        during the deposition.  It's important for you to
24        know if you need a break at any time, you're
25        entitled to a break.  So will you let me know if
```

```
 1   A.   I think it's a legal term.  In my classes I

 2        would -- I'm not sure I would define that beyond

 3        broken bones and, you know, the various ways the

 4        person could be badly injured by the suspect.

 5        Death is death.

 6   Q.   Do you know whether the state of Indiana has a

 7        definition for serious bodily harm?

 8   A.   I'm assuming they do.  I believe every state does.

 9        I can't tell you what it is.

10   Q.   Do you know if Illinois has a definition of serious

11        bodily harm?

12   A.   Yes.

13   Q.   What's their definition?

14   A.   Broken bones.  You know, it's relevant in cases of

15        battery.  It's relevant in felony DUI.  In fact, a

16        felony DUI, that's how they -- that's what makes it

17        a felony.  Great bodily harm asked upon by broken

18        bones, basically.

19   Q.   Are you familiar with the way

20        Indianapolis Metropolitan Police Department

21        officers are trained?

22   A.   Have I looked at any of their training materials?

23        No.

24   Q.   Do you know how long they're trained?  So for

25        instance, let's take one of our officers,
```

```
1          Officer Mengerink.  Do you know how long he was
2          trained?
3    A.    Not sitting here today.  It's a state mandate but
4          some departments, bigger, departments will have
5          their own program.  For example, in Illinois, it's
6          twelve weeks, but Chicago Police Academy will go
7          for twenty-four weeks.  So I'm not sure what
8          Indianapolis does.
9    Q.    So you don't know what police academy the officers
10         attend?
11   A.    I'm assuming they attend their own academy in
12         Indianapolis.  I know there's one in northern
13         Indiana, you know, one of those.
14   Q.    Do you know when any of the defendant officers
15         completed their police academy training?
16   A.    Yes.  I mean, I have all their training files.
17         Sitting here today, I can't tell.  But I have
18         reviewed their training files.
19   Q.    Do you know how long ago they would have completed
20         their training?
21   A.    I can't tell you sitting here, but I did review
22         their files.
23   Q.    Do you know if any of the officers completed
24         training at other training academies outside of
25         Indiana?
```

```
 1   A.   Sitting here right now, I can't tell.
 2   Q.   Do you know how much use-of-force training the
 3        officers had prior to August 8, 2015?
 4   A.   No, not sitting here today.  I couldn't tell you.
 5   Q.   Do you know if under federal law, does federal law
 6        have definition of serious bodily harm?
 7   A.   I don't know.
 8   Q.   With the -- so you started teaching at Benedictine
 9        and Lincoln Land, and then the Chicago School of
10        Professional Psychology.
11            What types of things did you teach there at
12        the Chicago School of Professional Psychology?
13   A.   Well, I have them listed.  I taught
14        Crisis Intervention.  I taught Research in Forensic
15        Psychology.  This was a forensic psychology program
16        I was teaching in, so it was a combination of law
17        enforcement officers.
18            There were also a number of Chicago police
19        officers in that program.  And then people earning
20        a PhD in Forensic Psychology.  So I taught those
21        three courses:  Research in Forensic Psychology,
22        Crisis Intervention, Mental Health Law.
23   Q.   Is there a difference?  So here the Marion County
24        Forensic Services Agency will collect a lot of
25        evidence and analyze evidence at these shooting
```

1       scenes.  Is there a difference between that type of

2       forensic science and forensic psychology?

3   A.  Yes.

4   Q.  Well, what's the differences?

5   A.  Well, forensic psychology is not what we call one

6       of the hard sciences.  Forensic Services would

7       include people that are trained in ballistics,

8       chemistry, serology, things of that nature.

9           Forensic psychology is simply a term used as

10      an umbrella term to encompass at least five

11      different areas.  We define forensic psychology as

12      the intersection of the methods and techniques of

13      psychology and the criminal justice mission.  It is

14      something much different than scientific forensic

15      services.

16  Q.  Have you received any training in ballistics?

17  A.  Well, it depends on what you mean by "ballistics".

18      A ballistics expert is an individual in a

19      laboratory whose primary purpose is to match a

20      particular bullet or casing or fragment to a

21      particular gun.

22          No, I do not do that.  I've never tried to do

23      that.  Sometimes that is confused with trajectory

24      analysis.  Ballistics experts in a laboratory do

25      not do trajectory analysis.  That's an

```
 1              investigative technique.  And, yes, I'm trained to
 2              do that.  I do that quite often.  But, no, I do not
 3              do ballistics.
 4    Q.   When you say that you do that "quite often", the
 5              trajectory analysis, how so?  How do you do that
 6              quite often?
 7    A.   In these particular cases.  So I've done cases
 8              where I've actually completed some sort of a
 9              trajectory analysis, probably thirty to thirty-five
10              cases.  And some of them are quite complex
11              involving multiple officers.
12                   They're always charted out in diagrams in my
13              reports.  Sometimes trajectory is important,
14              sometimes it's not.  But I would guess thirty-five
15              times, at least, I have completed a trajectory
16              analysis.
17    Q.   And we had talked earlier about your training.  And
18              it sounds like in 1990 you received some training
19              on trajectories.  Have you received any training on
20              that since 1990?
21    A.   Well, no training, but I've certainly advanced my
22              knowledge of it.  First of all, nothing's changed
23              since 1990.  Bullets still travel in a straight
24              line.  And when we do trajectory analysis, it's not
25              a complex science.  It's a matter of thinking
```

```
 1        critically and matching up entry and exit points.

 2        So nothing's changed since that training.

 3             But I've certainly advanced my own knowledge

 4        in teaching that particular issue in the

 5        criminalistic course.  I will tell you at

 6        Washington University one of my courses we do

 7        almost nothing but study police shootings.

 8             And we talk a lot about trajectory analysis.

 9        And part of the goal of that course is to present

10        the evidence to the extent that we can.  In some of

11        these cases around the country, they post all of

12        the discovery, you know, because they want

13        transparency.

14             Anytime we can get our hands on that, assuming

15        I'm not working a case myself, I don't include

16        those, but if we can get our hands on that, there

17        are times when we've used submitted employer

18        request to get it.  Then in my class, we'll do an

19        investigation right in the classroom.

20             So I provide an instruction on things like

21        trajectory analysis, how to look at evidence, how

22        to understand evidence with the intent of painting

23        a picture of exactly what happened.  So, anyway, to

24        answer your question, no training since 1990.

25   Q.   When you say, "bullets travel in a straight line",
```

1        is it ever possible that a bullet's trajectory can

2        be changed by something?

3   A.   Well, there's two different examples.  If ricochet

4        is an issue, I do not offer an opinion on that.

5        I'm not qualified to do that.  I'm not even sure a

6        ballistics expert is.  That would take somebody

7        with a physics background.  And there are people

8        specifically trained out there that can provide

9        that expertise.

10       There are times when things will happen to the

11       bullet once it enters the body.  I don't -- I offer

12       no opinion about that except entry and exit, or

13       short of an exit wound where the medical examiner

14       says the bullet ended up.

15       Now, I provide, in many cases I provided a

16       trajectory that involved the entry point and the

17       exit point.  If it becomes an objection as to what

18       happened in between those, I don't offer an

19       opinion.  I'm not qualified to talk about what

20       happens to it in the body.

21  Q.   So is it possible that ricochet could happen within

22       the body, as well?

23  A.   Well, it depends on the bullet.  It depends on the

24       extent to which the bullet fragments.  There are

25       times when a bullet will hit a bone and go multiple

```
 1          different directions.  There are times specifically

 2          with a high-powered bullet, like, a

 3          high-powered rifle, where the bullet will hit a

 4          bone and will change directions.  It will, you

 5          know, strike another part of body.  Certainly, to

 6          answer your question, yes.

 7    Q.    And based upon my military background, I know that

 8          some of the weapons that were used there, that the

 9          bullets actually leave the weapon with the intent

10          that they will ricochet.

11          Do you know whether officers use weapons where

12          that's the case where the bullets are intended to

13          ricochet?  Or how the officers guns are designed to

14          perform in this case?

15    A.    No.  In fact, just the opposite.  A police

16          officer's ammunition they use is designed to

17          flatten out when it hits a solid surface.  You're

18          referring to a high-powered rifle that will do

19          serious damage, because the intent in the military

20          is to kill someone.

21          The intent of policing is to stop a threat.

22          You're not necessarily wanting to kill them every

23          time, even though you might.  So to answer your

24          question, no, the bullets that police officers use

25          are designed to spread out on impact and certainly
```

```
 1        knock the person down and stop a threat, not

 2        necessarily to kill them.

 3   Q.   Earlier you testified that you would need a physics

 4        background to identify how ricochet had impacted

 5        the trajectory bullets; correct?

 6   A.   Well, no.  What I said was if ricochet becomes an

 7        issue in a case, I would not offer an opinion on

 8        that.

 9   Q.   How would ricochet become an issue?  In other

10        words, there'd be two different versions of how the

11        trajectories took place?

12   A.   Well, when a bullet ricochets -- an example.

13        Somebody who is shot, and, of course, this is only

14        a hypothetical.  Someone who is shot by a police

15        officer, and the police officer says it was

16        accidental.  They were shooting at something

17        different, and it ricocheted.  That would be an

18        example.

19   Q.   Is it possible that the bullets traveling through a

20        car door could ricochet and change trajectory?

21   A.   Certainly.

22   Q.   Do you know whether the bullets traveling through

23        the car door in this particular case ricocheted and

24        changed trajectory?

25   A.   Well, it's -- that's a complicated question in this
```

1           case, because there are multiple different types

2           of.  There are shots through the window, through

3           the windshield.  I would only argue that in my

4           experience, shot through a window does not change

5           trajectory.

6                It may flatten out.  It may fragment.  It may

7           create a different kind of entry wound than it

8           would if it had not gone through a window.  But

9           I've not seen a situation where going through a

10          window, it changes course.

11               Ricochets in a door.  I have had a situation,

12          for example, I've had a case where it came through

13          the column of the vehicle and hit the iron bracket

14          that the steering wheel's attached to.  And, so, an

15          entry point out here, an exit point over here,

16          (indicating) that we accounted for, by the fact

17          that it hit that piece of metal.

18               If you're referring specifically to the

19          bullets in this case, I'm not sure I offered any

20          opinion about that.

21     Q.   Would you need to have a physics background to

22          offer an opinion on that?

23     A.   Only if it became an issue.  You would not need a

24          physics background to say here's where the bullets

25          struck the car.  If it were a situation where when

```
 1        opinion was that a bullet went through the door and

 2        changed trajectories, but maybe you're not

 3        qualified to make that opinion; is that correct?

 4   A.   That's what I'm saying.

 5   Q.   And my question is:  How are you qualified to offer

 6        an opinion that when a bullet goes through a door,

 7        it didn't change directions?

 8             So in other words, if you're not qualified to

 9        testify about what happens with ricochet as a

10        bullet's going through the door in the positive

11        sense, wouldn't it be just as true in the negative

12        sense?  In other words, you can't testify about

13        what happened?

14   A.   No.  It would not be, because I have evidence to

15        the contrary.  If --

16   Q.   And what's that evidence?

17   A.   Well, if I have an entry point in a door, and an

18        exit point, I know the bullet didn't dance around

19        in there before it came out in a straight

20        trajectory.

21             My only point is:  If I have a straight

22        trajectory going through that door, it's not

23        possible for anyone to argue that something

24        happened to that bullet inside the door, and it

25        danced around before it came out in a straight
```

```
 1            trajectory.  That's what I'm trying to get to.
 2    Q.      Well, certainly.  But, so, were you actually -- did
 3            you have the opportunity to use any trajectory rods
 4            in this case?
 5    A.      No.  I relied on the police department.
 6    Q.      Would a trajectory rod tell you whether or not a
 7            bullet traveled from outside of the door, through
 8            the door, and into the vehicle in a straight line?
 9    A.      Yes.  If I -- if the trajectory rod goes through
10            the door, and the police department has made that
11            decision, I don't dispute it.
12    Q.      Do you know whether that occurred in this case?
13    A.      I don't know that I've seen any pictures with
14            trajectory rods.  There are times when I do that
15            myself.  I've not done that in this case.
16    Q.      So without the trajectory rod, how are you able to
17            opine the bullet came in and left through the door
18            in a straight line?
19    A.      I have not opined that.  I see the holes.  I see
20            the bullet defects in the door.  My opinion goes no
21            further than that.  Because the car was struck
22            thirteen times.  That's a --
23    Q.      And you don't know what happened to the bullet
24            after it came through the vehicle?  So in other
25            words, could it have ricocheted into the floor?
```

```
1          Into the ceiling?  Different variations?
2     A.   I haven't considered that.  I've considered the
3          number of times that it was struck.  I've
4          considered the trajectory which the officers were
5          at, based on what I see in the bullet holes, based
6          on the location of the casings.  And I've offered
7          an opinion about the fatal shot.
8     Q.   Well, so, you also offer an opinion about how the
9          bullet got into his right leg.
10    A.   I don't think so.  I think the only thing I said,
11         it was a back-to-front trajectory.  And that it
12         exited, I think that had an exit, or -- no.  It did
13         not.  It was removed.  I think that's one that was
14         removed from his body.  I don't think I've
15         discussed that beyond that.
16              I've only discussed the fatal, the trajectory
17         of the fatal shot.  I think it's extremely
18         difficult to determine an exact trajectory of legs
19         and arms.  I think the back is much easier, because
20         we have other points of contact, or lack of
21         contact.
22    Q.   So talking more about what happens when bullets
23         pass through something.  One of the opinions that
24         you offered as well is about the shattering of the
25         window; correct?
```

```
 1   A.   Yes.

 2   Q.   And if you take a look at the photographs,

 3        obviously, there are bullets that traveled through

 4        the windshield; is that correct?

 5   A.   Yes.

 6   Q.   And the windshield was not shattered?

 7   A.   That's correct.

 8   Q.   Is it possible for bullets to have traveled through

 9        a window without the window shattering?

10   A.   Well, I think you can only make a reasonable

11        conclusion.  And the answer is yes.  But I will say

12        that's a different kind of glass than the

13        windshield.  The windshield -- I've never had a

14        case where it has shattered when a bullet impacts

15        it.

16             I have had cases where the moment a bullet

17        impacts a side window, which is a different kind of

18        glass, that it immediately shatters.  I don't know

19        if that answers your question.  I think what you're

20        getting at, could there have been shots to that

21        side window before if fell out?  Certainly, yes.

22   Q.   Have you had cases where you've seen bullets

23        passing through a side window and the window not

24        shattering?

25   A.   I've had cases where bullets have passed through
```

```
 1          the side window, and it didn't shatter.  I've had

 2          cases where it shattered on impact.  If I had cases

 3          where it didn't shatter, and then at some other

 4          point the wind blew or whatever the case may be,

 5          and then it fell out?  No, I've not had that.

 6    Q.    What about if -- so if shots are going though the

 7          passenger window, would you think that those shots

 8          are going to weaken the integrity of the window?

 9    A.    Absolutely.

10    Q.    And, so, if shots traveled through the window,

11          weaken the integrity of the window, and then the

12          vehicle strikes something.  Is it possible that a

13          weakened window is going to shatter easier than

14          other windows?

15    A.    Well, anything's possible.  I'm not sure anybody

16          could answer that question in this case.  Because

17          it's going to require that they somehow

18          scientifically compare the impact to Phillips' door

19          with how many shots -- how many holes there were in

20          the window at the time, and we don't know.

21             And number one, we don't know how many holes.

22          We know how many shots, I think, went through that

23          window.  Whether they went through the glass or

24          glass was already gone, we know from the location

25          of the casings essentially where the officers were
```

```
1        standing when those shots were fired.

2            And we have evidence regarding how hard it hit

3        Phillips' vehicle.  Beyond that I don't know

4        there's much more we can tell.

5   Q.   What you just testified, are you saying

6        scientifically we can't say that shots did not

7        travel through the window before Officer Phillips'

8        car was struck?

9   A.   No.  I'm saying scientifically we can't make that

10       comparison.  We don't know how many shots, how many

11       holes there were in the window when the car struck

12       Phillips' door.  That's all I'm saying.

13  Q.   So based on that, is it your opinion that there

14       were bullet holes in the window before the vehicle

15       struck Officer Phillips' car?

16  A.   It's my opinion, and it is an opinion, based on the

17       location of the casings, it's my opinion that on

18       the first impact with a bullet, that window

19       shattered and fell through right where the car had

20       already stopped.  That's my opinion.

21  Q.   What's that based on?

22  A.   It's based on the location of the casings.  It's

23       based on the fact that I don't think it struck

24       Phillips' car hard enough to cause any damage like

25       that.  It's based on the fact that we know that
```

1    Mengerink fired multiple times through that window.

2    And we see where his casings are.  It's based --

3    and we can get a general location of where he was

4    standing based on what we know about the ejection

5    of the shell casings.

6         Whether or not one shot went through and the

7    second shot caused it to shatter would not change

8    my opinion in this case.  Number one, the car

9    didn't travel very far.  So there wasn't very much

10   distance before there could be shots through that

11   side window before it fell out.

12        What I can say definitively is it fell out

13   after it stopped.  And what I can say is, not

14   definitively, but a reasonable conclusion, is based

15   on the location of those shell casings, based on

16   Mengerink's testimony, based on the impact of that

17   vehicle hitting Phillips' car, it's my opinion, a

18   reasonable opinion, that those shots were all fired

19   after the vehicle stopped.

20        It's also based on the fact that in their

21   original statements they all said they fired after

22   the vehicle stopped.  Stewart said he fired after

23   the vehicle stopped.  Mengerink said in his

24   original statement that he didn't fire when the

25   vehicle was going forward.  It had already hit

1          Phillips' vehicle.  And he had a fear that he was

2          going to back up and pin them to another car.

3          Klonne, and forgive me, is that the way his name is

4          pronounced?

5     Q.   Klonne.

6     A.   Klonne testified in his original statement which

7          was that after he hit Phillips' vehicle he saw the

8          wheels turn.  And he was in fear of his own life

9          and being pinned against one of the other vehicles.

10         So there's a lot of different things that I based

11         that opinion on, including their own statements.

12    Q.   Okay.  So scientifically, would we be able to

13         perform a scientific investigation to determine

14         whether or not that window would have shattered

15         prior to hitting Officer Phillips' vehicle?  In

16         other words, is there a field science that would do

17         that type of work?

18    A.   I don't think we have to complete that analysis.

19         The vehicle was resting against Phillips' car.  The

20         window was shattered on the ground directly below

21         where it was sitting we know ultimately.  How many

22         times it was shot, we don't know.  We know

23         ultimately that glass fell out after that car

24         stopped its forward motion.  Because it's on the

25         ground right where it sits when the pictures are

```
 1        taken.

 2   Q.   Well, how do we know that shots weren't fired

 3        through that window before it hits the vehicle and

 4        the glass falls out?

 5   A.   Hey, I agree with you.  I just said that.  The

 6        question is:  Were there shots fired through that

 7        window before it got to the point where it hit

 8        Phillips' vehicle and the glass falls out?

 9   Q.   Are you able to offer an opinion about that?

10   A.   Yes.

11   Q.   And what is that?

12   A.   My opinion is -- I understand --

13   Q.   Is there scientific support for your opinion?  Or

14        it's just based upon where shell casings were

15        located?

16   A.   It's also based on their statements.  It's based on

17        all of their statements.  It's based on the

18        location of the shell casings, which is not an

19        exact science, I accept that.  And it's based on

20        the distance that Green had to travel which was

21        very -- didn't have much distance to travel.

22             So to answer your question, is it possible

23        that somebody shot through that window, and then it

24        traveled a few more inches or feet, and then the

25        window fell out?  Yes, yes.  Is there -- does that
```

```
 1   A.   All of them.

 2   Q.   -- and that sort of thing?

 3   A.   Yes.

 4   Q.   Okay.  Had you ever testified in court about a use

 5        of force?

 6   A.   No.

 7   Q.   The next section here, it's page numbered 4 of

 8        Exhibit 2, there's a paragraph here that talks

 9        about the reports that you had used.

10             Is this a complete list of everything you took

11        a look at when you were preparing your report?

12   A.   I think the only things I looked at later were the

13        depositions, none of which changed any of my

14        opinions.  And, in fact, I have included everything

15        on here so (indicating.)

16   Q.   Oh, okay.

17   A.   It's an up-to-date list.

18   Q.   Oh, okay.  And, so, we had served the subpoena.  We

19        were asking for documents that you had received.

20        And you've just indicated a thumb drive --

21   A.   Yes.

22   Q.   -- that would be the response to the subpoena?

23   A.   This -- yes.  This would be everything I looked at,

24        my current CV, my invoice, and any document that I

25        cited in my report.
```

```
 1   Q.   Okay, perfect.  Thank you so much for that.

 2        Now, one of the things that's listed on here

 3        is measurements.  Do you recall where those

 4        measurements would have come from that you reviewed

 5        when preparing your report?

 6   A.   I frankly think that was probably where I haven't

 7        seen any measurements.  That is, in fact, one of

 8        the things that I like to see in these cases.  I

 9        don't think there are in this case, at least that

10        I've seen.

11   Q.   Have you ever actually been to the location where

12        the shooting took place?

13   A.   Only with the Google, been there many times.

14   Q.   But in person --

15   A.   No.

16   Q.   -- you haven't actually been there?

17   A.   No.

18   Q.   Is that something -- do you ever plan on visiting

19        there?

20   A.   I seldom do.  I can see it from above on

21        Google Earth.  And Google Street View, I can go

22        right to it.  In fact, it's -- it doesn't do me a

23        lot of good to go, because unless everything's put

24        back in place and, you know, I can see exactly

25        where everything's at.
```

```
 1              The benefit of Google Earth is that I can see
 2         landmarks that I can then look in the pictures and
 3         identify and get some of my own approximate
 4         measurements.  But, no, I seldom go to the scene.
 5    Q.   With Google Earth, were you able to identify
 6         whether or not there were -- okay.  So backtrack
 7         here.  First, was it your position that Mr. Green
 8         was trying to flee by driving through the police
 9         vehicles?
10    A.   It's my opinion, that was his intent, yes.
11    Q.   When reviewing the scene, did you see whether or
12         not he had other options of ways he could have
13         drove out of that situation?
14    A.   I recall specifically looking at the fence line.
15    Q.   So you don't know if he could have just drove right
16         along the fence line, never hit one of the
17         vehicles, and just got out of the situation doing
18         that?
19    A.   I don't recall.  I don't dispute that.  I mean, I
20         think that fence line was open as I recall.
21    Q.   You talk about the statements here.  And I know we
22         talk a little bit about the officers' statements.
23         Particularly Officer Heiny's statement, was there
24         something about Officer Heiny's statement that you
25         found useful in preparing your report?
```

```
 1   A.   I don't recall.  I mean, if I cited that report in
 2        here which I think I did.  I mean, I think I
 3        referenced it.  But I can't say, specifically.  I
 4        don't recall.
 5   Q.   What about Thomas Williams?  Was there something
 6        about his statement that was useful in preparing
 7        your report?
 8   A.   Not that I recall.
 9   Q.   Here in the next paragraph it says, your services,
10        150 an hour for all services, but testimony.  So
11        obviously today you're testifying.  So your rate is
12        $200 an hour; correct?
13   A.   Yes.
14   Q.   With the services that you provided
15        plaintiff's counsel, have those been billed at $150
16        an hour?
17   A.   Yes.
18   Q.   Do you know how much you've billed plaintiff's
19        counsel?
20   A.   I believe $3,100.
21   Q.   Do you know how that's broken down?  Is that all
22        for preparing the report?
23   A.   I don't know.  But it's broken down on my invoice
24        which you will see on here.
25   Q.   Okay.
```

```
 1   A.   I don't charge for the initial review of the
 2        documents.  I charge primarily to write the report,
 3        and if new documents come in that I have to review
 4        as part of that report, and if I make updates to
 5        the report.
 6   Q.   What did you do to prepare for this deposition?
 7   A.   I think I spent about two hours in a hotel room
 8        reading my report.
 9   Q.   Did you review any of the statements?
10   A.   No.  I just reviewed my report.  Mr. McCain and I
11        had breakfast.  We didn't really go into much
12        detail.  But I think I had not read the report in
13        quite some time and I refreshed.
14   Q.   Okay.  So, now, earlier we had talked about when
15        this report was prepared.  You said June 16, 2018?
16   A.   Yes.
17   Q.   Do you know when you provided plaintiff's counsel a
18        copy of that report?
19   A.   I'm assuming on that date.
20   Q.   June 16, 2018?
21   A.   Yes.
22   Q.   Have you made any updates to the report since then?
23   A.   No.  I read depositions.  I may have -- I don't
24        believe I used anything from the depositions.  I
25        would have to look at my citations, but June 16th
```

1      would be the original report date that I gave it to

2      the attorneys.

3  Q.  When preparing this report, did you review the same

4      documents that you'd generally review when

5      preparing the report?

6  A.  Yes.

7  Q.  Is there anything that was missing that would be

8      helpful in forming your opinions?

9  A.  There were some things that I would like to see

10     that I didn't see.

11 Q.  What were those?

12 A.  I don't think they're available.  I would like to

13     see more information on the damage to Phillips'

14     car.  I found it interesting that in over

15     two-hundred photos, I don't think there was a

16     single photo of the damage to that car.  Except for

17     what I see in the photos of the Nissan and where it

18     was sitting.

19         Well, there are other things, but they don't

20     exist.  For some reason, they could not determine

21     casing number 29, who fired it.  I find that very

22     interesting based on my experience.  It's easy to

23     determine through process of elimination, it was

24     Stewart's.

25         But I would like to have seen some sort of

```
1            documentation as to why they couldn't determine

2            that.  It's quite easy to determine.  They also

3            couldn't, while they could identify who fired the

4            bullet from the leg, they couldn't identify who

5            fired the fatal bullet.

6                 As I recall, that bullet was intact.  It did

7            not fragment.  And, so, I would have liked to have

8            seen exactly why they couldn't determine that.  But

9            those things don't exist.  They don't write

10           negative reports as to why.  They can't.

11                Beyond that, I would like to have seen some

12           measurements on the casings.  Most police

13           departments do that.  I don't know why they didn't

14           in this case.  They plotted them out, you know, I

15           see that.  And I see the pictures, so I do compare

16           the two.  But I don't see any measurements which I

17           thought was unusual.  So that's all.

18  Q.       In reviewing these cases, have you ever had a case

19           where one of the shell casings, they weren't able

20           to identify what weapon that came from?

21  A.       No.  I've had cases where they just simply didn't

22           do it.  But I've seen this casing.  I've seen the

23           picture of it.  You know, obviously, it's been

24           smashed down, but the base of a casing does not

25           bend.  It's designed to survive the explosion of
```

1      the bullet.

2          And the way they identify these is with a

3      simple firing pin analysis.  A firing pin strike

4      doesn't go anywhere.  No matter how many times you

5      step on it.  So I don't know why they didn't, why

6      they couldn't.  I haven't seen an explanation, and

7      I've never had a case where they couldn't.

8   Q.  When you identified the number of shell casings,

9      the nineteen identified shell casings, were those

10     all outside of the vehicles?

11  A.  Yes.  One of them was on the vehicle -- on a

12     vehicle.

13  Q.  One of the identified shell casings, did that come

14     from within the Nissan?  Or on the Nissan?

15  A.  I will say it's not real clear in the

16     documentation.  I believe it was outside on the

17     windshield.  Originally, I thought it was inside.

18     The only way I could tell is from the picture, and

19     I believe it was on the outside.

20  Q.  So this time -- it's your understanding, it was on

21     the outside of the vehicle, the shell casing?

22  A.  And that is based on nothing but a picture, a

23     couple of different pictures that I interpreted

24     that way.

25  Q.  Okay.

1   A.   It -- yes.

2   Q.   With your introduction here, the second line it

3        talks about the suspects were described, two black

4        fourteen to sixteen-year-olds, at least one of whom

5        was brandishing a handgun.  Do you recall which

6        person was supposed to be brandishing the handgun?

7   A.   No.  No, and I believe I got that from the original

8        dispatch or the radio traffic.  But, no, I do not

9        recall.

10  Q.   Here, it's a couple of lines later, it says, "At

11       approximately 11:08 p.m. Officer Corey Heiny

12       spotted the suspect vehicle and began following it.

13       A number of other officers pulled behind, including

14       Heiny, Stewart, Phillips, Klonne, among other

15       officers."

16            Do you recall who those other officers were?

17  A.   The other name I have a problem with.

18  Q.   Mengerink?

19  A.   Mengerink.  He was one of them.  Keedy was one.

20       And there may be unnamed officers, but those are

21       the ones I know about by name.

22  Q.   Okay.  Here in this paragraph it says, "15-year-old

23       Andre Green attempted to maneuver the vehicle to

24       flee."

25            Where's the support for that?

```
 1   A.   Well, that's based on my opinion.  This is just a

 2        general introduction for the reader.  But that's

 3        based on my opinion and the movement of the car

 4        that he was attempting to flee.

 5   Q.   And describe the movement of the car.  What's your

 6        understanding of how the car moved?

 7   A.   I believe, if we were on video, I would demonstrate

 8        it, but I'll try to verbalize it.  I believe the

 9        Nissan had stopped.  I believe Heiny's car pulled

10        up.  Heiny pulled up to the left, near the rear

11        door.  He knew somebody was going to bail from that

12        door.  And he did what many officers do, he

13        attempted to try to block it.

14             As he's pulling up to that door, and, in fact,

15        Williams did bail.  And he did jump over the

16        fender.  There were fingerprints.  I don't think

17        anybody disputes that.  And then Heiny took off

18        after him with his taser.

19             Phillips pulled up on the right side, typical

20        felony traffic stop.  Stewart was offset between

21        them and behind.  And Mengerink and Keedy and

22        Klonne were back there somewhere.  Okay?  I know

23        there were three vehicles for sure, Heiny,

24        Phillips, Stewart.

25             As far as his movement, Williams jumps out,
```

```
 1          Heiny chases him.  Morris jumps out.  Phillips gets
 2          out of her car, at least begins to chase him down
 3          the west side of the fence in a westward direction.
 4          The other officers get out.
 5              I think what happened was, Morris -- I'm sorry
 6          Green, for whatever reason didn't think he could go
 7          west along the fence line.  He was going to try to
 8          turn around and thread the needle through Phillips'
 9          and Stewarts' car and whoever was back there.
10              He couldn't go to the other side, because that
11          wagon was parked there.  You've got Heiny's car and
12          a wagon.  There's no way to get through.  I think
13          the first thing he did was he backed up turning his
14          wheels to the left, and he ran into Heiny's car.
15          And we see a dent there.
16              I think he then pulled forward doing a
17          three-point turn, then backed up a second time and
18          ran his vehicle along the front right fender of
19          Heiny's vehicle.  And that's why we have the mark
20          on the Nissan and the damage to the fender.
21              I think that was it.  I think his intent was
22          to then turn, cut the wheel to the right and
23          takeoff.  I believe as soon as he put it in drive,
24          I don't even think he got the wheel turned.  Well,
25          he didn't get the wheel turned.  We know that for a
```

```
 1            Now, your question, is it possible that the

 2       bullet came through the door and somehow changed

 3       trajectory so that he could be upright and it would

 4       be coming upwards?  I don't know.

 5  Q.   Or even just on a level plane?  I mean, the officer

 6       could be aiming like this (indicating) through a

 7       window and shoot a level shot; correct?

 8  A.   Although, keep in mind, ricochet happens when a

 9       bullet hits a hard surface.  I don't know that it

10       happens when it goes through a relatively soft

11       door.  Because once it goes through the metal of

12       the doors, it's still going to go through a lot

13       more.

14            Could it hit a component in the door?  I don't

15       know, you know.  I would like to say that the

16       forensic people figured all this out, but I don't

17       think they did.  I don't think they did a full

18       analysis of these.  Do I believe that's what

19       happened here?  No, I don't.  I believe he was just

20       as I show.

21  Q.   Can you say scientifically it didn't happen?  Like,

22       for instance, if you had measurements, could those

23       measurements possibly allow you to do that?  If you

24       had used trajectory rods, would that allow you to

25       do that?
```

 1  A.   The question is, can I say scientifically that if
 2       one of the bullets that came through the door -- I
 3       think I can say the bullets came through the
 4       window, because they don't ricochet.  Can I say
 5       scientifically that the bullets that came through
 6       the door, that one of the them did not do something
 7       strange, and hit him in the back?
 8            First of all, there's still not a hole in the
 9       seat.  Okay?  So we know he's rotated
10       significantly.  And I think if I study that issue,
11       and we're going to offer an opinion, I would say
12       that's not scientifically possible.
13            It's not scientifically possible if the
14       trajectory does not change going through the door.
15       Because if it hits the metal of the door, it better
16       change at that point.  If it doesn't, it's not
17       changing.  Because its got soft material from that
18       point forward.
19            I have no evidence to suggest that that
20       happened.  And the forensics people have not said
21       that it happened, and I don't believe it happened.
22       I believe the bullet that hit him probably hit
23       nothing on its way to hitting him.
24  Q.   So earlier we had talked about the type of
25       background that you'd need to have to do that

```
 1        ricochet analysis.  Is that the same thing?  It's

 2        just you're offering an opinion, but you can't say

 3        based on your training that it couldn't have

 4        ricocheted?

 5   A.   No.  That's not what I'm saying.  What I'm saying

 6        is, there has to be evidence of a ricochet.  And if

 7        there is evidence of a ricochet, then you need

 8        somebody who is -- that can do some math on that.

 9        What I'm saying is, where it hits that door, if

10        there is a trajectory going through that door,

11        there's no ricochet.  It's not an issue.

12   Q.   With the shots being fired through the window, we

13        don't know what the trajectory was on those;

14        correct?

15   A.   I think we know they're aiming at him.  That's what

16        we know.  Is there any possibility through, number

17        one, is there a possibility that the bullet is

18        going to hit the window and change trajectory?  No,

19        I don't think there's any science that will support

20        that.  At most, it's going to flatten out and

21        create a bigger hole in him when it hits him.

22            Is there any possibility that with the window

23        out one of the bullets hits something, ricocheted

24        and went into his back?  No.

25   Q.   Well, I mean, what I'm saying is, with the window
```

```
 1        out you're assuming that officers are firing down;
 2        correct?
 3   A.   Yes.  But I don't know how else they would be
 4        firing.
 5   Q.   But we don't know that they were firing down.
 6   A.   I'm going to say I do know they were firing down,
 7        otherwise, they're not aiming at him.
 8   Q.   So how do you mean that?
 9   A.   If the officers are shooting into a vehicle and
10        shooting at someone, police officers are not
11        trained to shoot someone in the head.  They're not
12        trained to kill someone.  They're trained to stop
13        the threat.  And you do that by shooting center
14        mass.  It's probably going to kill them, but not
15        the point.
16            If they are outside the car, and they are
17        shooting as they are trained to shoot, and they're
18        shooting at center mass, they're shooting downward.
19   Q.   Well, how high would Green have been while he was
20        in the SUV?
21   A.   Well, I don't think it matters.  There's no way
22        they're going to shoot at center mass and not shoot
23        downward, otherwise, I don't think that's going to
24        happen.  I don't know how they would be shooting up
25        at him.
```

```
 1   Q.   Well, I mean, you obviously would be elevated being

 2        in the vehicle and being in the seat.  Do you know

 3        how high he was elevated?

 4   A.   No.  I think you can make some determinations based

 5        on his height in the autopsy and so forth.  But --

 6   Q.   Was that one of the things that you considered with

 7        your opinion?

 8   A.   No.  I didn't see any -- that question I don't see

 9        any relevance of my opinion or what I'm looking at.

10   Q.   Well --

11        MR. MCCAIN:  Counsel, can I interrupt you just

12        for a second.  Can she read that question back?

13   Did you say SUV?

14        MR. UPCHURCH:  Yeah.

15        MR. MCCAIN:  Okay.  Is the Altima an SUV?

16        THE WITNESS:  It's not an SUV.

17        MR. UPCHURCH:  I apologize.  I may have

18   misspoke and referred to the vehicle as an SUV.

19   There's clearly a photograph of the vehicle here on

20   Page 22, and it's not an SUV.

21   BY MR. UPCHURCH:

22   Q.   Now, going back to the questioning.  You did not

23        determine how high he would have been off the

24        ground when he was sitting in the vehicle, the

25        Altima?
```

```
 1  A.   No.  My answer was a two-part answer.  No, because
 2       I didn't feel it was relevant to my opinion.  If
 3       they shot through the window, they had to be
 4       shooting downward.  I think that was the question.
 5       They had to be shooting downward, otherwise, if
 6       they level it out to hit him in the back where he
 7       was hit, they're going to be hitting the car.  And
 8       we know they didn't hit the car with those shots.
 9            We know there's, like, six shots that go
10       through the window that did not hit the car.  If
11       the question is -- I'm not sure what the question
12       is.  But I think it is:  Is there any possibility
13       that any of these bullets ricocheted and hit him in
14       the back?
15  Q.   No.  What I'm asking now is how do you know they
16       were I aiming down?
17  A.   Because I know how close, approximately how close
18       they were to the vehicle based on the location of
19       their casings.  It's a fairly low-riding vehicle.
20       He's not a -- he wasn't a big man.  He is in the
21       front seat.  And they're going to shoot at center
22       mass.  I don't see any way that they could not have
23       been shooting downward.
24  Q.   So the second shot here in the autopsy reports,
25       "It's a perforating gunshot wound to the right side
```

```
 1         of the abdominal wall."
 2   A.    Yes.
 3   Q.    Did you consider what position you would have
 4         expected Mr. Green to be in when that shot?
 5   A.    Only -- what I considered was it had no up or down
 6         deviation, no significant deviation.  Did I make
 7         that an issue?  No.  My opinion is it went through
 8         the front of his abdomen.  It was a straight shot.
 9         So my opinion is he was leaning to his left which
10         is consistent with the fatal shot, too.
11   Q.    The third shot, perforating gunshot wound through
12         the left upper thigh.  Did you have an opinion
13         about what position he would have been in with
14         that?
15   A.    No.  My opinion on leg shots, as well as arm shots
16         is they become very difficult to determine a
17         trajectory.  I offered no opinion on those.
18   Q.    How about with this fifth shot here, that
19         perforating gunshot wound to the right shin?
20   A.    Well, the only thing, I believe the only thing I
21         said about that particular shot was it was a
22         back-to-front shot.  His leg has been to be
23         rotated, had to be rotated to the left with the
24         rest of his body.
25              I believe that's all I said about it.  I made
```

```
 1         a comment about the effect that that injury would

 2         have on his ability to stand up or to do much of

 3         anything.  I mean, that's the only significance for

 4         that from me.

 5   Q.    With all of these gunshot wounds, would you expect

 6         Mr. Green would have been rotated toward the door

 7         when he was struck by those bullets?

 8   A.    Not necessarily.  Keeping in mind that you have

 9         three officers shooting rapidly multiple times, he

10         could be making all kinds of movements inside that

11         car.  I mean, there's no way to tell.

12              It would be simplistic for me to say that he

13         simply rotated and hoped he didn't get shot.  He

14         could have been dancing around in the side of that

15         car too.  That's what happens when bullets are

16         flying.

17              The only thing I'm saying is, definitively, is

18         the trajectory of that fatal shot.  And I don't

19         make a big deal of it, but the trajectory of the

20         abdomen shot is straight across.  It's consistent

21         with him leaning over and rotating at some point.

22   Q.    When you say that he was -- the fatal struck him in

23         the back, have you seen the actual autopsy

24         photograph of where that bullet entered?

25   A.    Yes.
```

```
 1   Q.   The photograph of the --

 2   A.   No, I've seen both.

 3   Q.   Okay.  So you've seen the photograph of -- do you

 4        know with the fatal wound, approximately, how far

 5        onto his back would you say that is?

 6   A.   I don't know sitting here, but the autopsy provides

 7        an actual measurement from the top of his head and

 8        from the medial line of his back.  So you can

 9        pinpoint it pretty closely.

10   Q.   It's pretty close to his side?

11   A.   It was to the right side, yes.

12   Q.   With your report here on Page 19, there's an

13        exhibit --

14   A.   Yes.

15   Q.   With this diagram here, is this a diagram that you

16        prepared?

17   A.   Yes.

18   Q.   And how did you prepare that?

19   A.   That would have came from the autopsy diagram.

20   Q.   So?

21   A.   And --

22   Q.   I'm sorry?

23   A.   And it's, I mean, it's not an overlay.  I mean,

24        I -- it's, I put those on there myself.  Is it

25        close to within minute amounts?  No.  Is it close
```

```
 1            to within half an inch, or so?  Probably.
 2    Q.      So this here on the left side of the diagram, you
 3            believe that's consistent with what the photograph
 4            from what the autopsy shows?  Where that entry
 5            wound is?
 6    A.      Yes.  Although, I will accept that this body is
 7            not, is certainly not the same measurements as
 8            Green's body.  So I'm going based on the diagram
 9            shone in the autopsy report.
10    Q.      Okay.  You now have what's been marked as
11            Exhibit 4.  What's Exhibit 4?
12    A.      Well, I'm assuming that this would be Mr. Green.
13            And this is one of the autopsy pictures.
14            (Defendant's Deposition Exhibit 4 was marked
15            for identification.)
16    Q.      Have you seen this autopsy picture before?
17    A.      I saw the autopsy pictures.  I'm assuming I would
18            have seen this one.
19    Q.      Did you consider the placement of this wound when
20            you were preparing your diagram?
21    A.      Yes.
22    Q.      Do you believe that consistently lines up with the
23            picture in the diagram there?
24    A.      I think you have to be careful with this picture,
25            because his right arm is bent to the left.  That's
```

```
 1          going to contort the side of his body somewhat.  If
 2          you took your own arm and went to the left with it,
 3          it's going to distort that somewhat.  I think it's
 4          consistent with what I put on the chart.
 5     Q.   If you were trying to get out of a vehicle, your
 6          vehicle, what arm would you use to get out of the
 7          vehicle?
 8     A.   Well, it's hard to say.  If I'm trying to get out
 9          of my vehicle and bullets are flying everywhere,
10          don't know.  I honestly, I don't know.
11     Q.   Would you typically use your left hand?
12     A.   I'm not going to answer that, because I don't know.
13          I don't know.  I've not made an opinion about that.
14          There's no way to know.  I'd have to look at how
15          the Nissan door is open.  If I am -- I could see
16          both things.
17               If I'm turned to the left and hunched down,
18          trying to get out that door, I could just at easily
19          use my right hand as I would my left hand.  If I
20          opened the door up back by Heiny's car when the
21          bullets start flying, and I know I'm going to try
22          and get out.  I don't think there's any way to tell
23          that.
24     Q.   And one of the things, too, is you had testified,
25          you don't know if the door was opened before the
```

```
 1         vehicle actually made a collision with

 2         Officer Phillips' vehicle?

 3   A.    No, I don't.

 4   Q.    So as the vehicle is driving, he could have leaned

 5         over and opened the door.  Is that your opinion?

 6   A.    My opinion is that's what happened because I think

 7         at some point Phillips is banging on that window.

 8         I'm not -- she never said anything about the door

 9         being open.  And when Green backs up, I think that

10         she's over there banging on that window.

11             And I think as he puts it in drive to go

12         forward, the shooting starts.  She is bailing out

13         of the way.  She's in the line of fire.  And I

14         think that's when he opened the door.

15   Q.    Based on this photograph, would he have had to have

16         used his right arm to open that door?

17   A.    No.  My only opinion is he had to have been

18         significantly rotated and leaning down and that the

19         door had to be already open when he took that shot.

20   Q.    If he was still in the vehicle, and his arm was

21         down, wouldn't this have hit his arm?  The shot to

22         his side?

23   A.    If he was still in the vehicle?  No.  I mean, I'm

24         not sure I understand your question.  If he was

25         anywhere in the vehicle?
```

```
 1   Q.   So wouldn't you expect if he's not using his right

 2        arm that his arm would be where that bullet hole is

 3        located?

 4   A.   No, no.  I think there's no possible way to answer

 5        that question.  There's twenty bullets flying

 6        through that car, and he is jumping every which

 7        way, probably.  I don't think there's any

 8        possibility of answering that.

 9             The only thing I would say, and I'm not sure

10        that would be the case, because -- and I'm not

11        offering this as fact, but I think a reaction, an

12        instinctive reaction to anything like this is going

13        to be the arms over the face.  His arm up, but I

14        didn't consider that.

15   Q.   And right there, did you also lean away, as well?

16        Would that be an instinctive reaction as well, to

17        lean way from the shots?

18   A.   Yes.  Yes, if you knew where the shots were coming

19        from.

20   Q.   So here on Page 7 of your report you say, "We can

21        say with certainty that Item Number 29 was fired by

22        Stewart."

23   A.   Yes.

24   Q.   And, again, that's just based upon the process of

25        elimination; is that --
```

```
 1   A.   It's that using two different sources, yes.

 2   Q.   And what are those two sources?

 3   A.   The bullet count.  So I know how many bullets he

 4        was short.  And the identification by the forensics

 5        people of all the other nineteen casings.  He's the

 6        one that came up one short.

 7   Q.   And with the explanation of why you believe that

 8        was not identified, did you say it was because it

 9        was stepped on?

10   A.   No.  I believe it could have been identified.

11   Q.   What is, what do you take from the report not

12        identifying it, if you believe it should have been

13        identified?

14   A.   What do I take from the forensic report?  I don't

15        take anything.  I think they could have and should

16        have identified who fired that bullet.  It's a

17        firing pin analysis.  If nineteen other casings can

18        be positively identified between those three guns,

19        I don't know why they didn't identify that one,

20        because the base of that casing is not bent.  The

21        strike is still there.

22   Q.   In your report here, at some point you reference

23        the fact that you believe that casing was stepped

24        on; is that correct?

25   A.   Well, I think something bent it.
```

```
 1   Q.   Do you believe that it was stepped on?

 2   A.   Here's what I believe.  I believe that that seldom

 3        happens, because police officers know how to

 4        preserve casings.  They're very easy to spot at

 5        night by the people that are collecting them with a

 6        flashlight.  I believe it's possible that whoever's

 7        collecting them may have inadvertently stepped on

 8        it.

 9             But I also believe it doesn't matter in

10        determining the source of that casing.  If you look

11        at the picture, it's obviously bent.  So something

12        happened.

13   Q.   With the casings, when those, when they fire out

14        from the gun, are you able to identify where an

15        officer was standing based on where the casing ends

16        up?

17   A.   You can get an approximate location, yes.

18   Q.   Are there factors that could impact where the

19        casings end up?

20   A.   There are, but when you have multiple casings, you

21        look for patterns.  And if the patterns are

22        consistent, that's what you're looking for.

23   Q.   So when a casing leaves a gun and it hits ground,

24        is it possible for the casing to roll?

25   A.   Sometimes they do, and I will say this based on
```

```
 1            experience, it's very little.  There's no kinetic
 2            energy behind these casings.  They're mechanically
 3            ejected.  If they hit, it may roll on concrete a
 4            little bit.  It might.  And I've looked myself.
 5            I've gone out and tried this.  It's only a matter
 6            of a few inches.  That casing was not on a hard
 7            surface.
 8    Q.      Could a casing be kicked?
 9    A.      Anything's possible.  But I will tell you, police
10            officers, I've never had a case, and I've worked
11            many of these, where police officers kicked a
12            casing.  They know that that is one of the most
13            important pieces of evidence.
14                 Phillips told them to get to their car
15            immediately.  Nobody was back there.  As far as I
16            can tell, the only -- Stewart was on that side.  He
17            admits that.  Phillips was on that side, and she
18            was bailing out of the way when the shots fired.
19            Mengerink and Keedy were over there, but they don't
20            say anything about going back to where that casing
21            was found.
22    Q.      Well, and so, I guess that's what I'm trying to
23            understand.  There were officers that were moving
24            from where the shots were fired to the other side
25            of the vehicle; correct?
```

```
 1   A.   Yes.

 2   Q.   And if I understood you correctly, you just said

 3        it's your opinion that those officers could not

 4        have kicked one of these cases?

 5   A.   That's my opinion, yes.

 6   Q.   And that's just based upon you think officers never

 7        kick casings?

 8   A.   Well, that's one thing.  But if you look at the

 9        casings they would have had to somehow kick it over

10        the top of that Nissan.  Kick it under, kick it

11        around.  Somehow it had to get there in a strange

12        path of travel.

13             No.  I don't think it was kicked.  I think it

14        was ejected right there.

15   Q.   Have you ever been walking around and something

16        gets caught in your shoe?

17   A.   Yes.  And I expect that to be brought up.  I don't

18        accept it in this case, because police officers

19        know to preserve the scene.  They know to preserve

20        casings.  I'd have to look at their boots.  I'd

21        have to, you know, somehow it got over there.

22             And Stewart was over there.  He admits to

23        being over there very early.  No.  I don't think

24        anybody stepped on it and carried it over there.

25   Q.   So it's your testimony that after these officers
```

1    A.    No.

2    Q.    You still believe that was once it was hit?

3    A.    Yes.

4    Q.    There is a discussion of the .380 pistol.  What

5          significance do you believe that had?  It almost

6          seems -- are you saying that was planted?

7    A.    No.  I'm not saying that at all.  I'm saying from

8          the time the shooting stops, there is no

9          consistency in these officers.  I mean, on major,

10         major items, and I outline them.

11               Did Keedy run up there and put the cuffs on

12         him?  Well, no.  While the shots were being fired?

13         I don't believe that.  Phillips never even

14         mentioned him.  Phillips said she put the cuffs on

15         him.  You've got all these statements, that are not

16         only inconsistent, they're unrealistic, some of

17         them.

18               So I don't know what they're trying to do.  On

19         the .380, I am only trying to point out something

20         to me that's obvious.  It looks, even though we

21         know that he didn't shoot the .380, we know that

22         the officers didn't even see the .380.

23               It sure looks a little more justified if they

24         make the case, "Well, thank God we did shoot him.

25         Because when he fell out a .380 fell off his lap."

```
 1        And that's essentially what's being said here.  I
 2        don't believe that for a second.  I don't believe
 3        the evidence supports that.
 4             That statement was added to the narrative,
 5        just as I say here, to mitigate their use of force.
 6        I don't do that lightly.  But I think it's obvious
 7        to me that they drug him away from that car, which
 8        by the way, I have no problem with.  He's caught in
 9        there and they've got to get him away to handcuff
10        him.
11             That .380 was not under him.  The .380 ended
12        up ten feet, ten to twelve away with him.  They
13        found that in his pocket and set it next to his
14        body there.  So I'm only calling out something
15        that's very inconsistent in their statements.
16             Because in the same time they're talking about
17        the .380, none of them agree at all at, at all, in
18        what happened at that point.
19   Q.   Who do you think would have done that?
20   A.   Done what?
21   Q.   Removed a pistol from his pocket and planted it
22        under him?
23   A.   No, no.  I'm not saying anybody planted anything.
24        I'm not saying anybody did anything wrong.  I
25        think, I don't know.  I'm guessing it was Phillips.
```

```
 1          But that would have been completely appropriate to

 2      search him and find a gun and lay the gun over off

 3      to the side while you put him in handcuffs.  I'm

 4      not alleging anybody planted anything.

 5          All I'm saying is there is no way -- number

 6      one, we can go through a number of things.  There's

 7      no way he stepped out of that car and stood up like

 8      Stewart said, number one.

 9          Number two, there's no way Keedy grabbed him

10      in that car and pulled him out when the shots are

11      still being fired.  Keedy's not going to go

12      anywhere near that door when the shots are being

13      fired.  And none of the other officers even mention

14      seeing him, number two.

15          Number three, somehow the gun got up there by

16      his body.  They're not going to pick a gun up and

17      then lay it down again next to his body.  I don't

18      think it fell out of his lap or underneath him or

19      whatever.  I think it's clear what happened.

20  Q.  And you'd mentioned him standing up.  Is that just

21      based on your personal experience?  You just don't

22      believe somebody could do that?

23  A.  It's a lay opinion, and I think I say, you know,

24      you need a doctor.  Keep in mind, if he stood up,

25      he had to stay up with his heart blown out and a
```

```
 1              broken tibia.  Which is a -- you can't stand up
 2              with a broken tibia.  It's the major bone in your
 3              leg.  I don't think he stood up.
 4        Q.    With Page 13 of Exhibit 2, there is a statement
 5              here that says, "We can say with certainty that
 6              none of the officers saw the gun prior to the
 7              shooting, nor did any of them use the gun as their
 8              stated reason for shooting."
 9                   Do you think that the gun had, based upon the
10              evidence, do you think that the officers had reason
11              to believe there might have been a gun in the
12              vehicle?
13        A.    Yes.
14        Q.    Do you think that would have impact on how officers
15              approached this situation?
16        A.    Yes.
17        Q.    With the shell casings that were found in the
18              vehicle, do you believe that one of the shell
19              casings came from the .380 that was found at the
20              scene?
21        A.    I have no reason to dispute that.
22        Q.    With Page 20 of Exhibit 2.
23        A.    Yes.
24        Q.    The bullet holes here, are those holes that you
25              identified?  Did you create these exhibits?
```

```
 1   A.   Yes.  The numbers are mine.  Yeah, I took these,
 2        the police department's pictures, and then I put
 3        the numbers on them.
 4   Q.   Do you know when you would have done that?  Is it
 5        close to when you prepared the report?
 6   A.   Yes.  And I want to be clear, I'm not arguing that
 7        this was the progression of the shots.  I just
 8        arbitrarily put the numbers on there.
 9   Q.   Okay.  With the Exhibit on Page 21, is that also an
10        exhibit that you prepared?
11   A.   Yes.
12   Q.   Is there, like, software that you used to prepare
13        that.
14   A.   Yes, PowerPoint.
15   Q.   How did you determine how far to place these away
16        from one another?
17   A.   You know, the only thing I could rely on are the
18        pictures.
19   Q.   So are these based on any measurements or anything
20        like that?  Is it to scale?
21   A.   It's -- I think it's to scale, because I have got
22        the vehicle to scale.  If -- in these cases I
23        always rely on the police department's work.  I've
24        never had a reason to doubt the crime scene people.
25        They tend to take a lot of pride in what they do.
```

```
 1          And they do a good job.

 2              This case was a little more difficult because

 3          they didn't do it.  They didn't triangulate any

 4          cases.  So this is strictly from the pictures.

 5   Q.     So based upon this diagram where the body is and

 6          where Number 29 is located, where would you have

 7          thought Sergeant Stewart would have been standing

 8          when he fired that shot?

 9              And if you'd like, you can go ahead and mark

10          that with --

11   A.     Well, the casings eject to the right and to the

12          rear.  So if I were to, and again, this is not to

13          close scale.  But I would suggest, he was somewhere

14          close to where the body is shown here.  I'll just

15          put a big X right there.

16   Q.     So and just for -- oh, we'll eventually give it to

17          the court reporter here.

18   A.     Yeah.  Yeah.

19   Q.     But for clarification purposes, you placed an X on

20          Page 21 of Exhibit 2 where you believe

21          Sergeant Stewart was standing when he fired the

22          shot?

23   A.     Yes.

24   Q.     Outside of the vehicle?

25   A.     Yes.  And I placed it there for two reasons.
```

```
 1            Because that's consistent with the trajectory I

 2            show in the other exhibit, if that is, in fact,

 3            when the shot happened.  And it also -- well, wait

 4            a minute.  Can I use your pen?

 5   Q.   Sure.

 6   A.   I want to back that up.  I was asked to do that

 7            without thinking about it very much.  The shot has

 8            to eject to the right and to the rear.  I'm going

 9            to move this a little bit.  And, again, it's just

10            simply not to scale.

11            But I'm going to move it a little bit toward

12            the grass, so that he is shooting toward the door,

13            and the casing is ejecting to the right and to the

14            rear at approximately 45 degrees.

15   Q.   So now the X that you have circled is where you

16            believe Sergeant Stewart was standing when he --

17   A.   Approximately.

18   Q.   And you said that he was shooting toward the

19            Nissan, is that correct?

20   A.   Yes, toward the door.

21   Q.   And then you believe that the -- Mr. Green's body

22            was drug after that?

23   A.   Yes.  I believe they said that, and I don't dispute

24            that.

25   Q.   Okay.  So on Page 23 of Exhibit 2, there's a
```

```
 1         diagram here titled, Fatal Shot Scenarios.
 2   A.    Yes.
 3   Q.    Are these diagrams that you prepared?
 4   A.    Yes.
 5   Q.    And during -- so are the first three bodies, is
 6         that the possibility of the first scenario?  Or how
 7         are these divided?
 8   A.    No.  What I'm saying here is I believe that's what
 9         the body did regardless of which shot was the fatal
10         shot.  So it's just a matter of where in the
11         progression of him rolling out those shots took
12         place.
13             So what I did was simply look at the body
14         rolling out of the vehicle, because I don't think
15         he stepped out.  We know he got out of the vehicle,
16         but we know he didn't step out.  So I'm looking at
17         him rolling out of the vehicle where in that
18         progression those trajectories were.  That's what
19         I'm showing.
20   Q.    What's his final position of the body?  Do you
21         believe he continued to roll?
22   A.    I don't know, and I would not argue that that's
23         definitive.  I'm just showing.  We know he had some
24         momentum as he's falling out of the car.  I'm just
25         making an assumption with that final body.  I might
```

```
 1         even, if I could add to that, I might even have

 2         done that because perhaps their statements was,

 3         when they approached him, he was on his back.  I,

 4         honestly, I've got to look.  And I'm not sure.  But

 5         I don't think that final body is significant to my

 6         opinion.

 7    Q.   So do you believe that Officer Klonne's use of

 8         force was reasonable?

 9    A.   I don't believe any use of force was reasonable in

10         this case.  I don't believe the taser was

11         reasonable, and I didn't address that issue.

12    Q.   And let's stick with the -- avoiding the taser.

13    A.   Yes.

14    Q.   I don't think that's one of the claims in here.

15    A.   Yes.

16    Q.   Why don't you believe Officer Klonne's use of force

17         was reasonable?

18    A.   Because I don't believe any of the three were ever

19         at risk of being hit by that car.  I don't know how

20         else to say it.  I mean, it's standard in law

21         enforcement now, you don't shoot into a moving

22         vehicle unless somebody is shooting at you, or

23         somebody is at risk of being hit by the car.

24              I don't think there was ever a possibility of

25         these guys being hit.
```