UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ESTATE OF ANDRE ALEXANDER GREEN Deceased,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>CITY OF INDIANAPOLIS Indiana and several unknown members of the Indianapolis Metropolitan Police Department,<br>MARC KLONNE,<br>ADAM MENGERINK,<br>VINCENT STEWART,<br><br>　　　　　　Defendants. | No. 1:17-cv-02673-JPH-TAB |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Andre Green was fatally shot after an armed carjacking as he attempted to elude capture by Indianapolis Metropolitan Police Department ("IMPD") officers. Mr. Green's estate contends that the officers used excessive force. Defendants—the City of Indianapolis and Officers Marc Klonne, Adam Mengerink, and Vincent Stewart—have moved for summary judgment. Dkt. [36]. The officers are entitled to qualified immunity and the city is not subject to municipal liability so that motion is **GRANTED**.

I.
Facts and Background

**A. Mr. Green's encounter with IMPD officers**

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to

1

the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). The Court notes some factual disputes.

Shortly after 10:00 p.m. on August 9, 2015, IMPD officers received a dispatch about an armed carjacking with two suspects, one who fired four shots at a group of people. Dkt. 37-1; dkt. 37-2; dkt. 44-2 at 5 (Stewart Dep. at 31). That dispatch included a description of the two unidentified juvenile suspects, license plate information, and the type of car taken—a red 2013 Nissan Altima. Dkt. 37-1; dkt. 44-2 at 5 (Stewart Dep. at 31).

Andre Green, who was fifteen years old, was driving that car, with another juvenile in the passenger's seat. Dkt. 37-11 at 20–21, 41 (Klonne Dep. at 57–58, 94); dkt. 44-3 at 6 (Mengerink Dep. at 18); dkt. 44-9 at 2. Soon, about five marked police cars were tailing the Nissan as Mr. Green drove at a normal speed. Dkt. 44-2 at 9 (Stewart Dep. at 40); dkt. 44-3 at 9 (Mengerink Dep. at 25). Eventually, he turned onto a dead-end street. Dkt. 44-4 at 6 (Klonne Dep. at 43). Five officers drove after the Nissan: Adam Mengerink, Cory Heiny, Vincent Stewart, Marc Klonne, and Lorie Phillips. *See* dkt. 37-8 at 13 (Mengerink Dep. at 25).

The IMPD officers arranged their cars in a "tactical V formation," which is intended to stop a suspect vehicle while leaving distance between it and officers. Dkt. 37-11 at 14–15 (Klonne Dep. at 44–45); dkt. 44-3 at 10 (Mengerink Dep. at 28). This formation left no room for the red Nissan to fit through. Dkt. 44-3 at 12–13 (Mengerink Dep. at 33–34). The Nissan stopped

and the passenger jumped out and fled. Dkt. 44-3 at 13–14 (Mengerink Dep. at 34–35); dkt. 37-11 at 20–21 (Klonne Dep. at 57–58). Officer Heiny chased the escaping passenger. Dkt. 37-12 at 15 (Stewart Dep. at 44).

Mr. Green then turned the car around and drove toward the police vehicles. Dkt. 37-8 at 26, 31–32 (Mengerink Dep. at 38, 43–44); dkt. 37-11 at 29 (Klonne Dep. at 66). The parties dispute what happened next. Defendants contend that Mr. Green drove into Officer Phillips's car, backed into Officer Heiny's car, then revved the Nissan's engine and accelerated quickly forward into Officer Phillips's car again. Dkt. 37-8 at 35–37 (Mengerink Dep. at 47–49); dkt. 37-11 at 22–16 (Klonne Dep. at 59–63). Mr. Green's estate argues that Mr. Green drove forward slowly into Officer Phillips's car only once. Dkt. 44 at 8–10; dkt. 44-2 at 10–12 (Stewart Dep. at 49–51).

As Mr. Green drove toward Officer Phillips's car, three officers opened fire. They were concerned for Officer Phillips's safety because they didn't know where she was. Dkt. 37-8 at 26, 32, 35, 38–39, 41 (Mengerink Dep. at 38, 44, 47, 50–51, 53); dkt. 37-11 at 22, 28, 32, 40–42 (Klonne Dep. at 59, 65, 69, 93–95); dkt. 37-12 at 20, 32, 34–35 (Stewart Dep. at 49, 61, 63–64). Officer Mengerink fired eight shots through the Nissan's passenger window until he couldn't see the driver any more. Dkt. 37-8 at 7, 41–44 (Mengerink Dep. at 17, 53–56). Officer Stewart fired seven shots through either the passenger window or through the front windshield. Dkt. 37-12 at 24, 26–27 (Stewart Dep. at 53, 55–56); dkt. 37-8 at 44–45 (Mengerink Dep. at 17, 56–57). Officer Klonne fired five shots through the front windshield. Dkt. 37-11 at 7–8 (Klonne Dep. at 34–

35). Broken glass from the Nissan's driver's side door was on the ground where the Nissan stopped against Officer Phillips's car. Dkt. 44-2 at 13 (Stewart Dep. at 54); dkt. 44-7.

Mr. Green opened his car door and collapsed to the pavement. Dkt. 37-12 at 37–38 (Stewart Dep. at 67–68). Officers Phillips and Stewart approached Mr. Green and found a handgun next to or underneath him. Dkt. 37-12 at 40–43 (Stewart Dep. at 69–72); dkt. 37-13 at 7 (Phillips Dep. at 66). Mr. Green died immediately or within minutes from several gunshot wounds, one of which was to the right side of his back. *See* dkt. 44-9 at 4–5; dkt. 37-12 at 41 (Stewart Dep. at 70).

### B. Mr. Harmening's report

The estate's expert, William Harmening, prepared a report analyzing the facts. Dkt. 44 at 9–11. Mr. Harmening has been a law enforcement officer for about 36 years and is the program coordinator for Washington University in St. Louis's forensic-psychology program. Dkt. 44-8 at 3.

Based on that report, the estate contends that the Nissan slow-rolled into Officer Phillips's car with no acceleration, causing no damage. Dkt. 44 at 9–10. The report is also the basis for the estate's argument that Mr. Green was shot in the back after the Nissan stopped and after Officer Stewart ran to its driver's side. *Id.* The report also says that it's "reasonable to conclude" that the final shot must have come after Mr. Green started exiting the vehicle. Dkt. 44-8 at 9.

### C. Procedural history

Mr. Green's estate filed this action alleging excessive force against the individual officers and that the City of Indianapolis is liable under *Monell* for its officers' constitutional violation. Dkt. 1. Defendants have moved for summary judgment. Dkt. 36.

## II.
## Applicable Law

### A. Summary judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).

### B. Qualified immunity

"[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known.'" *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan,* 555 U.S. 223, 232 (2009)). This "clearly established" standard ensures "that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards,* 566 U.S. 658, 664 (2012) (quoting *Anderson v. Creighton,* 483 U.S. 635, 646 (1987)). Qualified immunity thus "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231.

The "difficult part" of the qualified-immunity test is "identifying the level of generality at which the constitutional right must be clearly established." *Volkman v. Ryker,* 736 F.3d 1084, 1090 (7th Cir. 2013). A "high level of generality" is not appropriate; instead, the question is "whether the law was clear in relation to the specific facts confronting the public official when he acted." *Id.* "Such specificity is especially important in the Fourth Amendment context," because "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix,* 136 S. Ct. at 308 (quotation and citation omitted).

In excessive force cases, "the result depends very much on the facts of each case," so officers are entitled to qualified immunity unless precedent "*squarely governs*" the case at hand. *Id.* at 309 (quoting *Brosseau v. Haugen,* 543 U.S. 194, 201 (2004)). While a case directly on point is not required,

6

"existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 308.

### III.
### Analysis

**A. Mr. Harmening's report**

Defendants argue that Mr. Harmening's report is inadmissible because it was not timely disclosed under Federal Rule of Civil Procedure 26(a)(2), because Mr. Harmening lacks the specialized knowledge required to form his opinions under Federal Rule of Evidence 702, and because the report is speculative and contradicted by record evidence. Dkt. 48 at 9–17. Mr. Green's estate responds that the expert-disclosure deadline was "arguably" extended, and Mr. Harmening has submitted an affidavit responding to Defendants' other arguments. Dkt 52 at 1–2; dkt. 52-1.

Federal Rule of Civil Procedure 26(a)(2) requires expert disclosures "at the times and in the sequence that the court orders." The "sanction for failing to comply" is that "the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." *United States v. Z Investment Props., LLC*, 921 F.3d 696, 698–99 (7th Cir. 2019) (quoting Fed. R. Civ. P. 37(c)(1)).

Here, Mr. Green's estate disclosed Mr. Harmening's report on November 21, 2018. Dkt. 48–3. The deadline to do so was September 7, 2018. Dkt. 11 at 3. The estate argues that the deadline was "arguably" extended to November 19, 2018, because the non-expert-discovery and dispositive-motion deadlines were extended. Dkt. 52 at 1–2 (citing dkt. 33; dkt. 35). But those extensions

7

did not reference or extend the expert-disclosure deadline, which is set out as a specific date in a separate paragraph of the Case Management Plan. Dkt. 11 at 3. The report was thus disclosed 75 days late.

The late disclosure means that the report cannot be used to oppose Defendants' motion for summary judgment "unless the failure was substantially justified or is harmless." *Z Investment*, 921 F.3d at 699. Exclusion is "automatic and mandatory," so it is the estate's burden to prove that an exception applies. *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008). Mr. Green's estate does not argue that either exception applies, *see* dkt. 52, so the report is inadmissible.

But even if the expert report had been timely, it does not create a genuine issue of material fact. "A witness who is qualified as an expert by knowledge, skill, experience, training, or education" may testify to matters within "the expert's scientific, technical, or other specialized knowledge." Fed. R. Civ. P. 702. Under this rule, experts may not offer expert testimony that is outside their area of expertise. *See Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000). Indeed, there is "no duty to respect expert opinions that are given outside a witness' field of expertise." *Schmidt v. Apfel*, 201 F.3d 970, 973 (7th Cir. 2000).

Mr. Harmening is a former law-enforcement officer and an expert in Forensic Psychology. Dkt. 44-8 at 3. He describes this area of expertise as "the intersection of the methods and techniques of psychology and the criminal justice mission." Dkt. 48-1 at 51 (Harmening Dep. at 51). His twenty-three-

page report offers some opinions that that appear to fit within this expertise, such as his analysis of the psychological phenomena of "contagious shooting." Dkt. 44-8 at 15-16.

But Mr. Harmening's report also opines on matters in which he is admittedly not an expert. For example, he offers conclusions about which shell casings were fired by which police officers, dkt. 44-8 at 12, but he testified that "a ballistics expert . . . match[es] a particular bullet or casing or fragment to a particular gun" and that he has "never tried to do that," dkt. 48-1 at 51 (Harmening Dep. at 51). He also offers conclusions about the speed at which Mr. Green's vehicle was travelling and the velocity at which it hit Officer Phillips' car without establishing his expertise in these areas. Dkt. 44-8 at 10-11. Finally, Mr. Harmening's report admits that establishing whether Mr. Green could have exited the Nissan after he was shot would require a medical pathologist's opinion. Dkt. 44-8 at 9.

Moreover, several of the report's central allegations do not align with record evidence. There is no designated evidence that the Nissan slow-rolled into Officer Phillips's car, or that Officer Phillips's car was undamaged. Dkt. 44 at 11; dkt. 48–5 (showing damage to Officer Phillips's car). Nor is there designated evidence to support the opinion that Mr. Green was fatally shot as he exited the stopped Nissan after initial shots were fired. Dkt. 44 at 10–11; dkt. 44-8 at 6–9, 11, 18. Relying on a shell casing found on the ground near the driver's side of the Nissan, the report concludes that the final shot was fired by Officer Stewart after the vehicle stopped and Mr. Green started exiting the

9

vehicle. *Id.* But Defendants' ballistics expert determined that the casing did not come from Officer Stewart's gun, dkt. 48-4 at 2, and Mr. Harmening is not a ballistics expert, dkt. 48-1 at 7 (Harmening Dep. at 51). *See Goodwin,* 232 F.3d at 609.

In total, the conclusions in the report that Mr. Harmening is qualified to make—such as opinions about the psychology of the police officers—are not material because, as explained below, the qualified-immunity analysis does not turn on those conclusions. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). On the other hand, the conclusions unrelated to psychology—such as the speed at which Mr. Green's car was travelling and the origins of the various shell casings—may be relevant to the qualified-immunity analysis. But they are not within Mr. Harmening's area of expertise or are unsupported by designated evidence, so they are not considered. *See Goodwin,* 232 F.3d at 609.

In sum, Mr. Harmening's report is inadmissible as untimely and nothing in it creates a genuine issue of material fact. *See Bourke v. Conger,* 639 F.3d 344, 347 (7th Cir. 2011); *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir. 1997).

**B. Qualified immunity**

To overcome qualified immunity, a plaintiff "must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott v. Sangamon Cty., Ill.,* 705 F.3d 706, 713 (7th Cir. 2013). Officers Mengerink,

Stewart, and Klonne argue that they are entitled to qualified immunity under either of those prongs because (1) they did not use more force than the constitution allows and (2) no clearly established law prohibited them from using deadly force in the circumstances they faced. Dkt. 38 at 30.[1]

The Court exercises its discretion to begin with the second, "clearly established law" prong of the qualified-immunity test. *See Pearson,* 555 U.S. at 236. Mr. Green's estate argues against this approach, claiming that the first prong governs here because officers can rarely be entitled to qualified immunity when using excessive force. Dkt. 44 at 18 (relying on *Lanigan v. Village of East Hazel Crest, Ill.,* 110 F.3d 467 (7th Cir. 1997)). But qualified immunity shields officers who make "constitutionally deficient" decisions if they reasonably misapprehend the law governing the circumstances. *See Brosseau,* 543 U.S. at 198. Presuming that qualified immunity rarely applies when officers violate the constitution would inappropriately collapse the second prong into the first. *See Findlay v. Lendermon,* 722 F.3d 895, 900 (7th Cir. 2013) ("The substantive constitutional test . . . does not collapse into the qualified immunity test . . . ."). Indeed, the second prong is "especially important" in the complex and varying factual situations that occur in the excessive force context. *Mullenix,* 136 S. Ct. at 308–09. The Court therefore does not address the first prong.

---

[1] "Qualified immunity is an individual defense available to each individual defendant in his individual capacity." *Estate of Williams by Rose v. Cline,* 902 F.3d 643, 651 (7th Cir. 2018). Here though, the Court considers the officers' qualified-immunity defenses together because Mr. Green's estate considers them together, dkt. 44 at 16–23, and because this is not a case in which "the facts relative to the alleged constitutional violation differ from defendant to defendant," *Cline,* 902 F.3d at 651.

Officers Mengerink, Stewart, and Klonne argue that their actions did not violate clearly established law. Dkt. 38 at 24–30. Mr. Green's estate responds first by citing the Fourth Amendment principles that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead," dkt. 44 at 13, 18 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)), and that "when feasible, some warning should be given before the use of deadly force," dkt. 44 at 19 (citing *Garner*, 471 U.S. at 11–12). While true, these principles are the type of "broad general proposition" that cannot overcome qualified immunity. *Mullenix,* 136 S. Ct. at 308. As explained above, qualified immunity can be overcome only by clearly established law governing the specific facts at hand. *Id.* at 308–09.

Turning to the specific facts here, the Supreme Court's 2004 *Brosseau* decision is instructive. 543 U.S. 194. There, an officer pursued a suspect to a Jeep, where the officer feared he would retrieve a weapon. *Id.* at 196. The officer broke the driver's side window with her handgun and hit the suspect on the head, but he started the Jeep and began to drive away. *Id.* The officer shot the suspect, striking him in the back, in part because she was afraid for other officers who she believed were on foot in the immediate area. *Id.* at 196–97. The Supreme Court held that qualified immunity applied because no case had found a Fourth Amendment violation "when an officer shot a fleeing suspect who presented a risk to others." *Id.* at 200. *Brosseau* thus "makes plain" that it was not clearly established at the time "that it was unconstitutional to shoot

a fleeing driver to protect those whom his flight might endanger." *Plumhoff v. Rickard,* 572 U.S. 765, 779 (2014).

Here, all three officers who fired feared for Officer Phillips's safety. Officer Klonne did not know where Officer Phillips was during the encounter, and he was concerned for her and for other officers. Dkt. 37-11 at 22, 28, 32, 40–42 (Klonne Dep. at 59, 65, 69, 93–95). Officer Stewart thought that Mr. Green was using the Nissan as a weapon and feared for Officer Phillips's safety because he believed she was still in her vehicle. Dkt. 37-12 at 20, 32, 34–35 (Stewart Dep. at 49, 61, 63–64). Officer Mengerink knew that Officer Phillips was not in her car, but she was no longer where he'd last seen her, so he was afraid that the Nissan had struck her or was dragging her. Dkt. 37-8 at 26, 32, 35, 38–39, 41 (Mengerink Dep. at 38, 44, 47, 50–51, 53).[2] All three officers also knew that an armed carjacking with shots fired had just occurred and that the Nissan's driver was one of the two suspects. Dkt. 37-11 at 11, 40–41 (Klonne Dep. at 41, 93–94); dkt. 37-12 at 13, 36 (Stewart Dep. at 42, 65); dkt. 37-8 at 10–11 (Mengerink Dep. at 22–23).

Mr. Green's estate cites several cases that he argues govern the facts here. *See Titran v. Ackman,* 893 F.2d 145 (7th Cir. 1990), *Clash v. Beatty,* 77 F.3d 1045 (7th Cir. 1996); *Palmquist v. Selvik,* 111 F.3d 1332 (7th Cir. 1997); *Ellis v. Wynalda,* 999 F.2d 243 (7th Cir. 1993).[3] But those cases were decided

---

[2] Officer Mengerink also feared for his own safety. Dkt. 37-8 at 41 (Mengerink Dep. at 53).

[3] Mr. Green also cites *Buchanan v. City of Milwaukee,* 290 F. Supp. 2d 954 (E.D. Wis. 2003); *Wallace v. Estate of Davies,* 676 N.E.2d 422, 427–28 (Ind. Ct. App. 1997);

13

before the events that gave rise to *Brosseau*. They therefore cannot alter *Brosseau*'s qualified-immunity analysis or its conclusion that no clearly established law shows "that it was unconstitutional to shoot a fleeing driver to protect those whom his flight might endanger." *Plumhoff,* 572 U.S. at 779–80 (citing *Brosseau,* 543 U.S. at 200).

Moreover, none of those cases are factually similar to this one, and none of them involve officers using deadly force to prevent injury to a third party. In *Titran,* the plaintiff alleged that during booking, officers broke her wrist wrestling her to the ground and then shocked her with a "cattle prod." 893 F.2d at 145–46. In *Clash,* the plaintiff alleged that after he was handcuffed, officers shoved him into a police car, injuring his knee. 77 F.3d at 1047. In *Palmquist,* the plaintiff alleged that officers shot and killed a man who was swinging a muffler pipe at them. 111 F.3d at 1334. And in *Ellis,* the plaintiff alleged that after he a threw a bag at an officer and ran away, the officer shot him in the back even though he "presented no immediate threat and was not apparently armed." 999 F.2d at 245–47. Each of those cases is too different to squarely govern this one, as required to overcome qualified immunity. *Mullenix,* 136 S. Ct. at 309.

---

*Craighead v. Lee,* 399 F.3d 954 (8th Cir. 2005); and *Porter v. City of Muncie,* No. IP 98-1491-C H/G, 1999 WL 33117261 (S.D. Ind. Nov. 22, 1999). These cases are also factually dissimilar and while they may shed light on Supreme Court and Seventh Circuit precedent, they cannot clearly establish a right. *See Estate of Escobedo v. Bender,* 600 F.3d 770, 782 (7th Cir. 2010) (decisions from other circuits must show "a clear trend in the case law that the recognition of the right by a controlling precedent was merely a matter of time"); *Anderson v. Romero,* 72 F.3d 518, 525 (7th Cir. 1995) ("[D]istrict court decisions cannot *clearly* establish a constitutional right.").

Mr. Green's estate also argues that *Estate of Starks v. Enyart,* 5 F.3d 230, 234 (7th Cir. 1993) "is strikingly similar to the facts here." Dkt. 44 at 21. There, police cornered a stolen taxi in a parking lot. *Starks,* 5 F.3d at 232. The driver backed the taxi into a police car then pulled forward, only to be blocked by a utility pole. *Id.* After the driver maneuvered the taxi again and floored the accelerator, an officer jumped into the path of the moving taxi. *Id.* Three officers opened fire. *Id.*

While many of those facts are similar to the facts here, *Starks*'s holding turned on a critical issue not presented here: whether one of the officers had jumped in front of the stolen car, leaving no chance for the driver to stop. *Id.* at 233–34 ("The essential dispute, therefore, concerns whether [Officer] Black moved from behind the pole before or after the cab started forward."). In light of that dispute, *Starks* held that an officer violates the Fourth Amendment by "'unreasonably creat[ing] an encounter' in which an individual would be 'unable to react in order to avoid presenting a deadly threat to [the officer].'" *Williams v. Ind. State Police Dept.,* 797 F.3d 468, 483 (7th Cir. 2015) (quoting *Starks,* 5 F.3d at 234). Here, there is no designated evidence showing, or any argument claiming, that an officer created the situation that caused the officers to fear for their own or other officers' safety. Dkt. 44 at 21–22; *cf. Soriano v. Town of Cicero,* 521 Fed. Appx. 565, 569 (7th Cir. 2013) (distinguishing *Starks* in part because no officer moved in front of the vehicle). But even if the facts here were more similar, *Starks* predates *Brosseau* and the Seventh Circuit has

15

since recognized a "lack of clarity in cases in this area." *Williams*, 797 F.3d at 483.

Moreover, in *Starks*, "the plaintiffs conceded that if an officer was faced with a fleeing felon driving toward him, the officer could justifiably shoot the driver. In other words, if [Officer] Black had been in front of the vehicle before the car started forward, all three officers could have fired and would be protected by qualified immunity." *Starks*, 5 F.3d at 233–34. *Starks* accepted that concession, so it cannot clearly establish the opposite. *See id.*

*Brosseau* best summarizes *Starks*'s relation to this case. 543 U.S. at 201. There, the Supreme Court said that *Starks* did not squarely govern *Brosseau*'s facts. Instead, the actions that the officer took out of concern for other officers "fell in the hazy border between excessive and acceptable force." *Id.* at 201 (quotation omitted). So *Starks* was not enough to "clearly establish" a Fourth Amendment violation. *Id.* Since it wasn't enough in *Brosseau*, it isn't enough here.

Moreover, neither *Brosseau* nor *Starks* (nor most of the other cases that the estate cites) involved a violent crime leading to the police encounter, while here the police dispatch reported a carjacking with shots fired. *See Brosseau*, 543 U.S. at 195–96; *Starks*, 5 F.3d at 232–33. That difference may have been decisive in *Starks*—the Seventh Circuit noted that the case was "difficult" in part because "the underlying crime was not accomplished violently." *Id.* Here, Mr. Green was suspected of having committed an armed carjacking with shots fired. And once blockaded on a dead-end street, he tried to escape instead of

16

stopping the Nissan or surrendering to officers. Based on these facts, the officers reasonably recognized that Mr. Green presented serious danger. For these reasons, *Starks* and the other cases that Mr. Green's estate cites do not squarely govern this case. *Mullenix,* 136 S. Ct. at 309.

Mr. Green's estate notes that the officers fired twenty shots and that Mr. Green was struck five times. Dkt. 44 at 8, 14. But when all shots are fired in one quick volley, the number of shots fired does not affect the qualified-immunity analysis. *See Plumhoff,* 572 U.S. at 777. The decision to use deadly force is the weightiest of decisions. *See Garner,* 471 U.S. at 10 ("The intrusiveness of a seizure by means of deadly force is unmatched."). When deadly force is justified, "the officers need not stop shooting until the threat has ended." *Plumhoff,* 572 U.S. at 777. Here, there is no evidence that any shots were fired after the initial volley.

Officers Mengerink, Stewart, and Klonne are entitled to qualified immunity.[4]

**C. *Monell* liability**

A municipality cannot be held vicariously liable under section 1983 for the actions of its agent or employee. *Los Angeles Cty. v. Humphries*, 562 U.S. 29, 35–36 (2010) (explaining *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978)). Rather, a municipality can be liable only for its own actions and corresponding harm. *Id.* "The critical question under *Monell* remains this: is

---

[4] Because the officers are entitled to qualified immunity, the Court does not address their argument that they were added as defendants too late under Federal Rule of Civil Procedure 15(c). *See* dkt. 38 at 32–35.

17

the action about which the plaintiff is complaining one of the institution itself, or is it merely one untaken by a subordinate actor?" *Glisson v. Ind. Dept. of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) (*en banc*). An action is one of the "institution itself," *id.*, when the municipality's "official policy, widespread custom, or action by an official with policy-making authority was the 'moving force' behind [the] constitutional injury," *Dixon v. Cty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (citing *Monell*, 436 U.S. 658; *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)); *see Humphries*, 562 U.S. at 36 (reciting the "list of types of municipal action" that can lead to liability).

These "stringent" and precise grounds for *Monell* liability are required by section 1983. *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 402–404, 415 (1997); *see Humphries*, 562 U.S. at 36. Courts must apply "rigorous standards of culpability and causation" to prevent municipal liability from collapsing into *respondeat superior* liability, which section 1983 prohibits. *Brown*, 520 U.S. at 405, 415.

The City of Indianapolis argues that municipal liability cannot apply because any deprivation of Mr. Green's constitutional rights was not caused by (1) its express policies, (2) its implicit policies or custom, or (3) a person with final policymaking authority. Dkt. 38 at 31. Mr. Green's estate responds by arguing only that the city has "a widespread practice of not disciplining its officers involved in the use of deadly force" as evidenced by the fact that "IMPD did not discipline Klonne, Mengerink, or Stewart for their use of force on August 9, 2015." Dkt. 44 at 25.

18

Showing an implicit policy or custom through a widespread practice requires evidence showing more than a "random event." *Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010). Yet Mr. Green's estate has not designated evidence of any prior similar incidents, as required for *Monell* liability. *See Thomas*, 604 F.3d at 303 (recognizing that "even three" incidents cannot support *Monell* liability); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). Instead, the estate cites only the events that gave rise to this case. That is not enough to support municipal liability. *Daniel v. Cook County*, 833 F.3d 728, 735 (7th Cir. 2016) ("To prove an official policy, custom, or practice within the meaning of *Monell*, Daniel must show more than the deficiencies specific to his own experience, of course."). The City of Indianapolis is entitled to summary judgment on the *Monell* claim.

## IV.
## Conclusion

Defendants' motion for summary judgment, dkt. [36], is **GRANTED**. Final judgment will issue in a separate entry.

**SO ORDERED.**

Date: 11/13/2019

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Andrew R. Duncan
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS, LLP
ard@rucklaw.com

Grant E. Helms
OFFICE OF CORPORATION COUNSEL
grant.helms@indy.gov

Jamon Rahi Hicks
DOUGLAS HICKS LAW
jamon@douglashickslaw.com

John F. Kautzman
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS, LLP
jfk@rucklaw.com

Trent A. McCain
MCCAIN LAW OFFICES, P.C.
Trent@McCain.Law

Edward J. Merchant
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS, LLP
ejm@rucklaw.com

Andrew J. Upchurch
OFFICE OF CORPORATION COUNSEL
andrew.upchurch@indy.gov